**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH MORGAN and DAVID JOHNSON on behalf of Plaintiffs and the class members described herein, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 1:24-cv-01004 |
| ROSEBUD LENDING LZO d/b/a ZocaLoans; 777 PARTNERS, LLC; TACTICAL MARKETING PARTNERS, LLC; F3EA CAPITAL, LLC; F3EA SERVICING, LLC; F3EA HOLDINGS, LLC; and JOHN DOES 1-10, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT – CLASS ACTION

1.      Plaintiffs Joseph Morgan and David Johnson ("Plaintiffs") bring this action to secure redress from predatory and unlawful loans (such as <u>Exhibits A-I</u>) made in the name of Defendant Rosebud Lending LZO d/b/a ZocaLoans ("Rosebud Lending"). Other parties involved in making the loans are 777 Partners, LLC ("777 Partners"), Tactical Marketing Partners, LLC ("Tactical"), F3EA Capital, LLC ("F3EA Capital"), F3EA Servicing, LLC ("F3EA Servicing"), and F3EA Holdings, LLC ("F3EA Holdings"). Defendants 777 Partners, Tactical, F3EA Capital, F3EA Servicing, and F3EA Holdings are collectively referred to as the "777 Defendants."

2.      The loans had triple-digit interest rates, often exceeding 500%, and are illegal in many states, including Illinois.

3.      Plaintiffs Joseph Morgan and David Johnson seek a declaratory judgment that the loans are void and an injunction against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III – the Predatory Loan Prevention Act provides that

violations are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count IV).

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

5. This Court also has jurisdiction over this lawsuit under 28 U.S.C. § 1332(d) because Joseph Morgan and David Johnson, on the one hand, and Defendants, on the other, are citizens of different states; there are more than 100 members of the classes (as defined herein); and the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest and costs.

6. This Court has personal jurisdiction over each Defendant because they:

a. Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group*, *LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

c. Purposefully directed the lending operation at Illinois consumers and with

2

the intent of availing themselves of the privileges of doing business in Illinois. As detailed below, 777 Partners designed and implemented the lending model and actively participated in the affairs of the enterprise. 777 Partners uses Tactical, F3EA Capital, F3EA Servicing, and F3EA Holdings as conduits for its supervision, control, and profits of the lending business. All of this was done with the intention of furthering a nationwide scheme which took advantage of consumers in Illinois and throughout the United States. Put differently, Defendants' management, oversight, and control over the usurious lending practices were undertaken with the intent to make and collect on loans to Illinois borrowers. Defendants purposefully availed themselves to the jurisdiction of this Court.

7.     Venue is proper because acts to obtain and collect the loans impacted Joseph Morgan and David Johnson in the Northern District of Illinois.

8.     Article III of the Constitution of the United States is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiffs

9.     Plaintiffs Joseph Morgan and David Johnson are natural persons and residents of Cook County, Illinois.

### Defendants

### Rosebud Lending LZO

10.     Defendant Rosebud Lending LZO d/b/a ZocaLoans is or was an online lender that offers  loans to consumers at annual percentage rates exceeding 500%. (Exhibit I) It purports to be an entity formed under the laws of, and claims to be owned and controlled by, the Rosebud Sioux

Tribe, a federally-recognized Indian Tribe in South Dakota. (Exhibit A, p. 1) Rosebud Lending uses the addresses P.O. Box 1147, Mission, South Dakota 57555 and 27565 Research Park Drive, Mission, South Dakota 57555. Rosebud Lending has no colorable claim to sovereign immunity as an "arm of a tribe."

11.     The Mission Address purportedly houses the offices of REDCO, the Rosebud Economic Development Corporation. It is also the offices of Rosebud Office Solutions which purports to be engaged in "providing streamlined supply and procurement for local businesses and governmental entities."

12.     On information and belief, REDCO's general manager, Mindi Jo Vavra was an executive for Fintech Financial, LLC, a non-tribal, Delaware-based "warehouse lender" which provides working capital to make loans to consumers for several online payday lenders.

13.     The Mission Address is also home to:

    a.      The Lakota Water Company;

    b.      The Sicangu Community Development Corporation, an IRS-recognized 501(c)(3) non-profit corporation; and

    c.      Tatanka Funds, a non-profit which provides down-payment assistance and home buying assistance in south central South Dakota.

14.     Neither Rosebud Lending nor any other consumer lending business operates at the Mission Address.

15.     The license that purports to authorize the making of loans by Rosebud Lending LZO d/b/a ZocaLoans was signed by Eric Lochen, an attorney based in Minnesota with ties to various tribal lending schemes, on behalf of the "Financial Services Regulatory Authority." Mr. Lochen is not a member of the Rosebud Sioux Tribe, nor any other federally-recognized Indian tribe.

16.      The Rosebud Sioux Tribe claims to own Rosebud Lending, but its involvement in the lending business is merely superficial. The Tribe's only real contribution is to provide a cloak of

4

sovereign immunity for the lending activities complained of herein.

17. Subsidiaries of entities that claim to be owned by REDCO have purported to operate various websites, all of which charge consumers triple-digit interest rates, including:

      a.     AdvanceMeToday.com, owned by "Rosebud Lending AMT";

      b.     FirstPayLoans.com, owned by "Rosebud Lending BHL";

      c.     MyQuickWallet.com, owned by "Rosebud Lending DRT";

      d.     PixyCash.com, owned by "Rosebud Lending PCL"; and

      e.     QCredit.com, owned by "Rosebud Lending RQC."

18. On information and belief, each of these websites represents a "rent-a-tribe" scheme with a different, non-tribal investor or investors.

19. The lending enterprise doing business as ZocaLoans operated for the principle benefit of: (a) 777 Partners, (b) F3EA Capital, (c) F3EA Servicing, (d) F3EA Holdings, and (e) Tactical — all non-tribal entities organized under Delaware law and located in or around Miami, Florida.

20. 777 Partners, F3EA Capital, F3EA Servicing, F3EA Holdings, and Tactical are referred to as the "777 Defendants."

21. The 777 Defendants pay Rosebud Lending a small percentage of the revenues generated from ZocaLoans' loans in a "rent-a-tribe" agreement as outlined herein. For example, REDCO's Annual Report for 2019 showed Rosebud Lending with $51 million in assets, but REDCO only receiving $3 million in revenues, and a "management fee" of over $30 million paid out to non-tribal entities. Rosebud Lending, in turn, pays REDCO a nominal share of the monies it receives for the use of REDCO and the Tribe's name.

22. Defendants sought out Illinois residents for loans. ZocaLoans' website states that it makes loans to residents of Illinois but not residents of other states. On information and belief, the selection of states is tied to the likelihood of state officials taking enforcement action against Defendants.

**777 Partners, LLC**

23.     Defendant 777 Partners, LLC is a Miami-based private investment and equity firm founded by Joshua Wander and Steven W. Pasko.

24.     777 Partners is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its managers are Steven W. Pasko, Joshua Wander, Ed Gehres, John Sicilian, Tom Staz, and Damien Alfalla.

25.     777 Partners claims to own Defendant F3EA Servicing.

26.     777 Partners receives the overwhelming majority of the profit from the ZocaLoans enterprise. It knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers.

27.     777 Partners is the ultimate beneficiary of the ZocaLoan lending operation.

**F3EA Capital, LLC**

28.     Defendant F3EA Capital, LLC is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

29.     F3EA Capital provides capital used to fund loans made by ZocaLoans and is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

30.     F3EA Capital is an affiliate of 777 Partners.

**F3EA Servicing, LLC**

31.     Defendant F3EA Servicing, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131 and 1855 Griffin Road, B390 Dania, FL 33004.

32.     According to 777 Partners' website, F3EA Servicing "provides origination,

6

servicing, compliance and underwriting capabilities to various loan and leasing portfolios. F3EA supports client growth through its end to end servicing infrastructure...".

33. An attorney named Mollie Wander – Joshua Wander's wife – is a member of F3EA Servicing. Ms. Wander is intimately involved in the operation of ZocaLoans and negotiated the contracts awarded to the 777 Defendants along with Ed Gehres, the former General Counsel of 777 Partners.

34. Marie Gizzi, an employee of F3EA Servicing, states that she works for "Zocaloans subsidiary of F3EA Servicing LLC" and that, in her capacity as a loan processor, she "[r]eview[s] and analy[zes] loan applications, credit bureau reports, bank statements and financial documentation to ensure all loan documentation is complete, accurate and verified before submitting to underwriting." *Id.*

35. Vanessa Ponce, an employee of F3EA Servicing, purports to be a "Customer Service Supervisor at Zoca Loans."

36. F3EA Servicing is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

37. F3EA Servicing has collected hundreds of millions of dollars of ZocaLoans payments made by consumers.

## F3EA Holdings, LLC

38. Defendant F3EA Holdings, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

39. On information and belief, Joshua Wander, co-founder of 777 Partners, sits on the board of F3EA Holdings.

40. F3EA Holdings has provided capital used to fund loans made by ZocaLoans and has collected loans made in the name of ZocaLoans.

41. F3EA Holdings knowingly contracted for or received, directly or indirectly, unlawful

7

interest from loans nominally made by Rosebud Lending to consumers.

### Tactical Marketing Partners, LLC

42.     Defendant Tactical Marketing Partners, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131.

43.     On information and belief, Tactical obtains consumer reports (credit reports) as agent or authorized service provider for Rosebud Lending.

44.     Tactical knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers.

### Overview of Defendants' Enterprise

45.     On information and belief, 777 Partners approached individuals associated with the Rosebud Sioux Tribe in 2015 with a pitch to create an online lending business. In exchange for use of the Tribe's economic development corporation's name, 777 Partners offered to provide the capital used to fund loans made by ZocaLoans and provide the resources necessary to operate all aspects of an online lending operation.

46.     777 Partners has total control of Rosebud Lending and manages all substantive aspects of the lending business. For example, 777 Partners and its affiliates, among other things: (i) maintain a sweeping security interest in the lending operation; (ii) control the lending operation's operating account by way of a deposit account control agreement; and (iii) are responsible for, among other things, marketing, servicing, funding, and collection of loans made in the name of Rosebud Lending.

47.     777 Partners has seen that its affiliates and subsidiaries receive all lucrative marketing and servicing contracts and has entered into multiple revolving loan and security agreements whereby it has advanced close to $100 million to fund the underlying loans.

48.     The 777 Defendants also provide the technological and data science infrastructure

8

to underwrite the loans.

49.     All material policies and procedures relating to the lending operation are instituted  by the 777 Defendants without input from the Rosebud Tribe, REDCO, Rosebud Lending, or Rosebud Lending LZO.

50.     Loans made in the name of Rosebud Lending are funded by 777 Partners, F3EA Capital, F3EA Servicing, and F3EA Holdings.

51.     The monies used to fund loans made in the name of ZocaLoans are kept in bank accounts controlled by the 777 Defendants to which the Rosebud Tribe Sioux Tribe, REDCO, Rosebud Lending, and Rosebud Lending LZO have no access.

52.     F3EA Servicing entered into two Master Servicing Agreement with Rosebud Lending and provides a comprehensive suite of services to the ZocaLoans enterprise, including, but not limited to:

    a.      Marketing;

    b.      Call center;

    c.      Compliance;

    d.      Administrative;

    e.      Lead generation;

    f.      Risk and underwriting;

    g.      Modeling;

    h.      Collection; and

    i.      Risk-based marketing.

53.     UCC filings reveal that F3EA Capital has a security interest in Rosebud Lending's:

    a.      Assets including proceeds and products;

    b.      Negotiable instruments including proceeds and profits; and

    c.      Accounts including proceeds and profits.

54.     F3EA Capital has entered into multiple revolving loan and security agreements

with Rosebud Lending.

55.     Rosebud Lending claims that only the following three people are involved in the operation of ZocaLoans: "Clay Colombe, REDCO Chief Executive Officer, Mandy Medearis, Rosebud Lending LZO d/b/a ZocaLoans Operations and Compliance Manager, and Leah Running Bear, Rosebud Lending LZO d/b/a ZocaLoans loan specialist."

56.     The claim is false. There were numerous other persons involved in the ZocaLoanS enterprise, but all were associated with the 777 Defendants.

57.     Domain registration records from 2019 show that www.zocaloans.com is registered to 777 Partners (Exhibit K).

58.     The profile of Jennifer Menard, a Senior Operations Analyst at 777 Partners, states that, "[p]rior to joining 777" Menard "was employed by F3EA Holdings in April 2016, with the ZocaLoans portfolio as payment processor..."

59.     On information and belief, 777 Partners has ties to other high interest payday lenders. *See, e.g.*, www.777part.com/team_member/ed-gehres/ ("Mr. Gehres also recently served as outside General Counsel to Think Finance); www.777part.com/team_member/matthew-ghourdjian/ ("Mr. Ghourdjian served as [ ] the CIO of DiTech.com and CashCall."); www.777part.com/team_member/hussien-sleiman/ (last visited April 5, 2022) ("Mr. Sleiman was the lead technical architect and manager on the development of the CashCall and LoanMe cloud native lending and servicing platforms").

## FACTS RELATING TO PLAINTIFFS

60.     Plaintiff Joseph Morgan obtained a loan from Rosebud on September 6, 2021 (Exhibit A).

61.     Plaintiff David Johnson obtained a series of loans from Rosebud (Exhibits B-I)

62.     The loans were written on standard form loan agreements used by Rosebud Lending LZO d/b/a ZocaLoans on a regular basis.

63.     Defendants regularly make loans to individuals in Illinois, and throughout the United

10

States, at such rates.

64. The loans were obtained for personal, family or household purposes and not for business purposes.

65. At no time have any of the Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

66. Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

67. Defendants sought out Illinois residents for such loans.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

68. Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

69. Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

70. Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

71. Any loan made by an unlicensed person to an Illinois resident at more than 9% interest is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and

void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

72.     Loans made by an unlicensed lender to an Illinois resident at an interest rate exceeding 9% violates the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

73.     Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1*et seq.*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

74.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 11cv8149, 2017 WL 758518, at *11 (S.D.N.Y. Feb. 27, 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

75.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g.*, *In the Matter of Red Leaf Ventures, LLC*, No. 12 CC 569; *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

76.     In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses–such as the 777 Defendants–engage in a business model commonly referred to as a "rent-a-tribe" scheme.

77.      Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

78.     The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

79.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

80.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

81.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

82.     These so-called "tribal lenders" usually do not survive scrutiny when examined

13

closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

83.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

84.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g.*, *United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

85.     Indeed, "[t]ribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

86.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## COUNT I - DECLARATORY AND INJUNCTIVE
## RELIEF AGAINST ILLEGAL CONDUCT

87.     Plaintiffs incorporate paragraphs 1-86.

88.     This claim is against all Defendants.

89.     There is a controversy between Plaintiffs and the class, on the one hand, and

14

Defendants, on the other, as to whether Plaintiffs must repay outstanding loans.

90.    Declaratory relief will resolve such controversy.

91.    An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

92.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

93.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan has not been paid in full.

94.    Plaintiffs may alter the class definition to conform to developments in the case and discovery.

95.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

96.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

97.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

98.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

99.    Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

100.   The class is entitled to a declaration that Defendants are not entitled to collect on the

loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

      i.     Injunctive relief;

      ii.    Declaratory relief;

      iii.   Restitution of all amounts collected on the loans from members of the class;

      iv.   Costs of suit; and

      v.    Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

101.    Plaintiffs incorporate paragraphs 1-86.

102.    This claim is against all Defendants.

103.    Defendants contracted for and collected loans at more than 9% interest from Plaintiffs and the class members, in violation of 815 ILCS 205/4.

104.    Plaintiffs and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

105.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

106.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

107.    Plaintiffs may alter the class definition to conform to developments in the case and discovery.

108.    The class is so numerous that joinder of all members is not practicable. On

16

information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

109.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

110.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

111.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

112.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

      i.    Damages as provided in 815 ILCS 205/6;

      ii.    Attorney's fees, litigation expenses and costs of suit; and

      iii.    Such other and further relief as the Court deems proper.

## COUNT III – PREDATORY LOAN PREVENTION ACT
## AND ILLINOIS CONSUMER FRAUD ACT

113.    Plaintiffs incorporate paragraphs 1-86.

114.    This claim is against all Defendants.

115.    Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

116.    Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

17

## CLASS ALLEGATIONS

117.     Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

118.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

119.     Plaintiffs may alter the class definition to conform to developments in the case and discovery.

120.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

121.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

122.     Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

123.     Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

124.     A class action is superior for the fair and efficient adjudication of this matter, in that:

     a.     Individual actions are not economically feasible.

     b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

     i.     Compensatory damages;

     ii.     Punitive damages;

18

iii.      Attorney's fees, litigation expenses and costs of suit; and

iv.      Such other and further relief as the Court deems proper.

## COUNT IV – RICO

125.    Plaintiffs incorporate paragraphs 1-86.

126.    This claim is against Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, and F3EA Capital, LLC who are the RICO "persons." 18 U.S.C. § 1964(3).

127.    Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, and F3EA Capital, LLC violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

128.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

129.    The means and methods by which the 777 Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Illinois, where the usurious rates charged were at least twice the enforceable rate. The 777 Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Illinois, and various other state laws, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

130.    In addition to legal limits of interest that may be charged under Illinois law, most other jurisdictions in the United States have limits on the amounts of interest that a lender may charge. *See, e.g.,* Ariz. Rev. Stat. §§ 6-603, *et Seq.*; Ark. Const. Amend. 89, § 3; Ark. Code Ann. §§ 4–57–104, 4–57–105; Conn. Gen. Stat. § 36a–563; Fla. Stat. §§ 516.01(2), 516.03, 516.031, 687.071(3); Ga. Code Ann. §§ 7–3–6; 7–3–14, 7–4–2, 7–4–18, and 16–17–1, *et Seq.*; Md. Code Ann. Com. Law §§ 12–306, 12–313, 12–314; Mass. G. L. c.140, §§ 96, 110; N. C. Gen. Stat. §§ 53–173,

53–176; N. H. Rev. Stat. Ann. § 399–a12; N. J. Stat. Ann. §§ 2c:21–19(a), 17:11c-3, 17:11c-41; N. Y.
Gen. Oblig. Law § 5–501; N. Y. Banking Law § 14-a(1); N.Y. Penal Law § 190.40; Vt. Stat. Ann. Tit.
8, § 2230; Vt. Stat. Ann. Tit. 9, § 41a. All of the loans made to members of the Class and Subclass
and collected by the Defendants included an interest rate far in excess of twice the enforceable rate.
Each of the Defendants was associated with the enterprise through the collection of unlawful debts.

131.     Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise" engaged in, and whose
activities affect, interstate commerce, in that it is located outside of Illinois and makes loans to
Illinois residents via the Internet. The enterprise's leadership is based in Miami, Florida, and other
locations as addressed in preceding paragraphs. The enterprise operates throughout the United
States, including the Northern District of Illinois, as well as in foreign countries.

132.     Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital are
associated with this enterprise, in that they direct the making of loans by Rosebud Lending LZO and
finance the operation.

133.     The enterprise has an ongoing organization with an ascertainable structure, and it
functions as a continuing unit with separate roles and responsibilities

134.     The 777 Defendants have all participated in the formation and operation of this
scheme to defraud borrowers while attempting to take advantage of tribal immunity through the
association with the Tribe.

135.     The lending enterprise operates through ACH transactions, such as those involving
the payments by Plaintiffs. These ACH transactions involve interstate commerce because they flow
through Rosebud Lending's bank account in Missouri, Plaintiffs' bank account, and through various
intermediaries across the United States. Additionally, the enterprise involves the receipt of usurious
interest through interstate banking transactions to the 777 Defendants in Miami, Florida.

136.     The lending enterprise operates through a website, created and overseen by the 777
Defendants, at www.zocaloans.com. The website furthers the illegal financial transactions. The
website allows individuals to enter information to execute ACH wire transfers to the individual

borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

137.     The 777 Defendants work together and function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the 777 Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

138.     Acting in concert, the 777 Defendants created the ZocaLoans enterprise with essential lending services provided by F3EA Servicing so that they could attempt to take advantage of the doctrine of tribal sovereign immunity for the express purpose of trying to avoid state and federal laws that regulate and ban payday lending at usurious rates of interest.

139.     The 777 Defendants defined the types of loans that ZocaLoans would offer to customers and the illegal terms on which the loans would be created.

140.     The 777 Defendants acted in concert in knowingly marketing the loans via the Internet and through pre-screened marketing solicitations to borrowers who reside across the United States–including Illinois–and off of Tribal lands.

141.     The 777 Defendants exercised pervasive control over the lending operation as detailed in the previous sections.

142.     As alleged above, the 777 Defendants, and other participants not yet known to Plaintiffs, violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

143.     In operating and conducting the affairs of the enterprise, the 777 Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise. The 777 Defendants have modified and reinvested their collections of net revenue from the enterprise to improve the optics and viability of the business model.

144.     The predicate acts of collection of unlawful debt by the 777 Defendants are

described herein. The debts incurred by Plaintiffs and all other members of the Class and Subclass are unlawful and unenforceable.

145.     The 777 Defendants established the illegal enterprise and have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiffs' and Class and Subclass members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the ZocaLoans enterprise.18 U.S.C. §§ 1341, 1343. The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

146.     777 Partners, acting in concert with F3EA Servicing, F3EA Capital and F3EA Holdings, operated ZocaLoans in a scheme to defraud tens of thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates. To advance this scheme, the 777 Defendants created the ZocaLoans enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme. Defendants knowingly intended to defraud Plaintiffs and other the victims of the lending scheme.

147.     The racketeering activity at issue is related and continuous. The hundreds of thousands of ACH transactions served and continue to serve the central scheme created and developed by the 777 Defendants to make illegal loans at extortionate interest rates. The hundreds of thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits – for non-Tribal members. The scheme to evade state laws was designed, implemented, and/or maintained by the 777 Defendants through ZocaLoans.

148.     The 777 Defendants' leadership, management, and participation in the enterprise

began at some point as early as 2015, and continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Illinois consumers. Each of the 777 Defendants, working in concert, participated in the scheme through a coordinated pattern of racketeering; such efforts include oversight and approval of the collection of thousands of unlawful debts. Through such coordination, operation, and management of the lending business, the 777 Defendants induced Plaintiffs and members of the Class and Subclass to repay unlawful debts. The foregoing record demonstrates that 777 Partners, through its subsidiaries or affiliates, and in concert with others, created the entire lending structure in an effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to stamp out.

149.    Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital conducted or participated in the conduct of the affairs of ZocaLoans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

150.    Plaintiffs were deprived of money as a result of the 777 Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for the 777 Defendants' conduct.

151.    In addition, Plaintiffs and members of the below Class and Subclass have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, the 777 Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class and Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964 (c).

## CLASS ALLEGATIONS

152.    Plaintiffs bring this claim on behalf of one Class and one Subclass, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

153.    The class consists of: all persons (a) to whom a loan was made in the name of

23

Rosebud Lending LZO d/b/a ZocaLoans, (b) while residents of the United States (except Delaware, California, Idaho, Missouri, Wisconsin and Utah), and (c) which loan was made on or after a date four years prior to the filing of suit.

154.    The subclass consists of: (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans (c) which loan was made on or after a date four years prior to the filing of suit.

155.    Plaintiffs may alter the above class definitions to conform to developments in the case and discovery.

156.    The Class and Subclass are so numerous that joinder of their members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 20,000 members of the Class, and at least 1,000 members of the Subclass.

157.    There are questions of law and fact common to members of the Class and Subclass, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

> a.    Whether the loans at issue are "unlawful debts" as defined in RICO.
>
> b.    Whether Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise."
>
> c.    Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital are associated with Rosebud Lending LZO d/b/a ZocaLoans.
>
> d.    Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital conducted or participated in the affairs of Rosebud Lending LZO d/b/a ZocaLoans through a pattern of making and collecting unlawful loans.

158.    Plaintiffs will fairly and adequately represent the members of the Class and Subclass. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

159.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclass.

All are based on the same factual and legal theories.

160.     A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.     Individual actions are not economically feasible.

    b.     Members of the Class and Subclass are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the Class and Subclass and against Defendants for:

    i.     Treble damages;

    ii.     Attorney's fees, litigation expenses and costs of suit; and

    iii.     Such other or further relief as the Court deems proper.


*/s/ Daniel A. Edelman*
Daniel A. Edelman


Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6297473)
Dulijaza (Julie) Clark (ARDC 6273353)
**EDELMAN, COMBS, LATTURNER**
    **& GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com


## JURY DEMAND

Plaintiffs demand trial by jury.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman